UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

               Plaintiff,                       No. 1:20-cr-189

v.                                         Hon. Jane M. Beckering
                                         U.S. District Judge

DENNIS LYNN CARTWRIGHT, JR. &
MYKAEL LEE BOOKER,

               Defendant.

_____/

**UNITED STATES' TRIAL BRIEF**

The United States respectfully submits this trial brief to provide a summary of the facts it intends to prove at trial and to highlight legal issues that may arise during the trial.

I.    **Factual background**

    A.   *Overview*

This is a case about two drug dealers who agreed to link their businesses. Dennis Cartwright and Allen Moore opened a series of companies that they used to disguise their drug proceeds as lawful income. Meanwhile, they agreed with each other and with other people to buy and sell cocaine, cocaine base, heroin, and marijuana. One of those people was Mykael Booker, a courier who moved drugs and money.

All three men were overheard on wire intercepts when the DEA started investigating them. All three men had drugs in their homes when investigators

arrived with search warrants. All three men kept firearms nearby to protect their drugs and drug proceeds.

There are two conspiracies charged in this case, and Mr. Cartwright is the sole defendant charged in both of them. The first is a multi-substance drug conspiracy charged in Count 1 of the Third Superseding Indictment. The second is a concealment money laundering conspiracy, run in support of the drug conspiracy, which is charged in Count 8. Both conspiracies began in 2018, when Mr. Moore began depositing cash drug proceeds into the bank accounts for businesses that he owned jointly with Cartwright.

The other charges in this case concern drugs and guns. Mr. Booker is charged with possession with intent to distribute cocaine base (crack cocaine) (Count 2) along with possession of a firearm in furtherance of drug trafficking (Count 3). Mr. Cartwright is charged with possession with intent to distribute cocaine (Count 4), felon in possession of firearms (Count 5), possession with intent to distribute marijuana (Count 6), and possession of firearms in furtherance of drug trafficking (Count 7).

### B. _People, Places, and Businesses_

One helpful way to orient to the facts in this case is to focus on the key people, places, and key. Below is a summary of those topics.

***Key People***:

- **Dennis Cartwright** – the leader of the drug trafficking and money laundering conspiracies. As discussed above, he is charged with in a multi-

drug conspiracy (Count 1), possession with intent to distribute cocaine (Count 4), felon in possession of firearms (Count 5), possession with intent to distribute marijuana (Count 6), possession of a firearm in furtherance of drug trafficking (Count 7), and conspiracy to commit concealment money laundering (Count 8).

- **Mykael Booker** – a courier and distributor who moved drugs and money for Mr. Cartwright. In this case, Mr. Booker has already pleaded guilty to cocaine conspiracy and to possessing ammunition as a convicted felon. He is proceeding to trial on two other charges, possession with intent to distribute cocaine base (Count 2) and possession of a firearm in furtherance of drug trafficking (Count 3).

- **Eiland Kwest Johnson** – a Detroit-area source of cocaine for Mr. Cartwright and Mr. Booker. Mr. Johnson has already pleaded guilty to cocaine conspiracy. There are no charges pending against Mr. Johnson.

- **James Allen Moore** – a multi-substance drug dealer who partnered with Mr. Cartwright to "wash" his drug proceeds in business accounts that he and Mr. Cartwright controlled. In this case, Mr. Moore has already pleaded guilty to cocaine conspiracy, possession with intent to distribute controlled substances, and possession of firearms in furtherance of drug trafficking. There are no charges pending against Mr. Moore.

*Key places*:

- **The Auto Den** – a used car dealership operated by Mr. Cartwright. It became a base of operations in both the drug and money laundering conspiracies. When investigators searched it on December 1, 2020, they found a rifle, cocaine, and a digital scale inside.

- **7073 Eastern** – the home of Mr. Cartwright in 2020. Mr. Cartwright used his dwelling to coordinate his drug trafficking and money laundering. When investigators searched it on December 1, 2020, they found thousands of dollars in cash, three pistols, approximately nine pounds of marijuana, and a digital scale, all in the basement.

- **Muffler Man** – an auto repair business operated by Mr. Moore. Like the Auto Den, it served as a base of operations for drug dealing. When investigators searched it on December 1, 2020, they found cocaine, marijuana, a digital scale, a hand press, thousands of dollars in cash, and a Brinks padlock key.

- **100 Burton Street, Apt. 306** – the home of Mr. Moore. Like Mr. Cartwright, Mr. Moore also used his home to coordinate drug trafficking and money laundering. When investigators searched it on December 1, 2020, they found a digital scale, about 142 grams of heroin, and about 52 grams of cocaine base (crack cocaine) in the kitchen cabinet. There was also a Brinks padlock key that matched the key found inside the Muffler Man.

- **Storage Unit on Prairie Street** – a storage shed used by Mr. Moore. When investigators searched it on December 1, 2020, they found about 500 grams of cocaine, about 10 grams of heroin, three firearms, a money counter, and a ballistic vest.

- **3037 Wingate Drive, Apt. 2-B** – an apartment in Kentwood where investigators found Mr. Booker on November 22, 2020. That day, investigators listening to the wire overheard Mr. Booker arming himself to shoot a person who hadn't paid a debt. They rushed to intercept him, and Mr. Booker noticed he was being followed, so he re-routed back to the Wingate apartment.  Within hours, investigators secured a search warrant. When they executed the warrant, they found cocaine base, bricks of fake powder cocaine, a digital scale, and a pistol box with .45 caliber ammunition inside.

*Key Businesses:*

- **Cartwright Construction** – a sham company created by Mr. Cartwright. Investigators looked for any evidence of construction equipment and workers. They found none. The business was used as a pass-through business for money laundering.

- **851 Davis** – a business controlled by both Mr. Cartwright and Mr. Moore. The business was started in 2017 by Mr. Cartwright, and Mr. Booker was added as an owner in 2018. The business had no stated purpose, and there are no tax returns associated with it.

- **Car Genie** – an unlicensed car dealership with a corresponding bank account at J.P. Morgan Chase. Mr. Cartwright and Mr. Moore jointly opened the Car Genie Bank account in 2018. When investigators watched the alleged business location throughout 2020, they found no evidence of employees, customers, or sales.

- **The Auto Den** – as discussed above, this was a used car dealership operated by Mr. Cartwright. The business did have some lawful business activity – it sold many used cars. But Auto Den also functioned as a physical front for drug operations. In addition, Mr. Cartwright used Auto Den's bank account to launder drug proceeds.

- **Muffler Man** – as discussed above, this was an auto repair shop operated by Mr. Moore. Like Auto Den, Muffler Man conducted some legitimate business activity. However, also like Auto Den, it also functioned as a physical front for drug dealing.

### C. *Wire Intercepts*

Wire intercepts were a crucial part of this investigation, particularly when combined with physical surveillance. Consider the following events that occurred in October of 2020. On October 1, 2020, Eiland Johnson called Mr. Cartwright and offered him $1700 per "zip" or $54,000 per kilogram "book." (As the government's drug experts will explain, this was a price quote on cocaine – "zip" means an ounce, "book" means a "kilogram," and the only drug being sold at these prices during the fall of 2020 was cocaine.)  Mr. Cartwright told Mr. Johnson that he would get back to him

quick.  On October 11, 2020, Mr. Cartwright confirmed that Codefendant Mykael Booker was going to "mak[e] that move" for him.  On the night of October 12, 2020, Mr. Booker called Mr. Cartwright and asked, "The normal plan?"  Mr. Cartwright agreed, and Booker told him, "He had it in zips . . . other than like three hundred, four hundred grams."  They agreed to meet the next morning.  Surveillance saw Mr. Booker's rental car pull into Mr. Cartwright's car lot, the Auto Den, the next day.

The drugs that Mr. Johnson gave to Mr. Booker for Mr. Cartwright were fronted, and Mr. Johnson began trying to collect payment almost immediately. Investigators intercepted numerous calls in October and November 2020 in which Mr. Cartwright and Mr. Booker coordinated and discussed paying Mr. Johnson back. For example, on October 20, 2020, Mr. Booker and Mr. Cartwright had a call in which Mr. Booker said he was "takin' him the cheese I got for the shit . . . I ain't buyin' nothin' else . . . Ain't no extra cheese for it right now."  Mr. Cartwright replied, "I don't either . . . I'm waitin' on a couple things to shake."

### D. _Financial Investigation_

While Mr. Cartwright was coordinating cocaine sales with Mr. Booker, Mr. Johnson, and others, James Moore was also distributing cocaine in the Grand Rapids area.  He and Mr. Cartwright agreed to help each other by laundering their drug money.

As discussed above, Mr. Moore and Mr. Cartwright had several interrelated businesses – Auto Den, LLC; Cartwright Construction; 851 Davis, LLC; Car Genie, LLC; and Muffler Man.  Each of the businesses had accounts at JP Morgan Chase.

Both Mr. Moore and Mr. Cartwright were signers on the Car Genie and 851 Davis accounts.  In the factual basis of his plea agreement, Moore acknowledged:

> During the conspiracy, [Moore] used a portion of his cash drug proceeds to purchase cars in partnership with Dennis Cartwright. Beginning in or about November 2018, Moore also deposited cash drug proceeds into the bank accounts for businesses that he owned jointly with Cartwright. Cartwright was aware that [Moore] sold cocaine and that a portion of the money that they used in their businesses was derived from drug proceeds.

(PageID.243.)

From November 2018 through December 2020, Mr. Cartwright and Mr. Moore deposited, transferred and withdrew more than one million dollars in cash through these accounts.  This amount was in excess of their legitimate business income during that period.  Investigators also intercepted phone calls in which Mr. Cartwright and Mr. Moore discussed their banking and business practices.

## II.    Elements

### A.    Count 1 – Drug Conspiracy

Mr. Cartwright is charged in Count 1 with conspiracy to distribute and possess with intent to distribute controlled substances, in violation of 21 U.S.C. § 846. A conspiracy to distribute controlled substances has two elements: (1) two or more persons conspired, or agreed, to distribute a controlled substance, and (2) the defendant knowingly and voluntarily joined the conspiracy. Sixth Circuit, Pattern Criminal Jury Instructions § 14.05 (2022). No overt act is required. The Third Superseding Indictment charges that the conspiracy involved 500 grams or more of a mixture or substance containing a detectable amount of cocaine. It also alleges that

8

the conspiracy involved heroin, cocaine base (crack cocaine), and marijuana, but there is no quantity allegation for these other controlled substances.

### B. *Counts 2, 4, and 6 – Possession with Intent to Distribute*

This case involves three counts of possession with intent to distribute a controlled substance (PWID). The elements are the same for each offense – all that changes is the substance alleged and the defendant accused. Count 2 involves cocaine base (crack cocaine) (Mr. Booker). Count 4 involves cocaine (Mr. Cartwright). Count 6 involves marijuana (Mr. Cartwright).

The elements of possession of a controlled substance with intent to distribute are (1) the defendant knowingly or intentionally possessed a controlled substance and (2) the defendant intended to distribute the controlled substance.  Sixth Circuit Pattern Criminal Jury Instruction 14.01 (2022).

### C. *Counts 3 and 7 – Possession of a Firearm in Furtherance of Drug Trafficking*

Both defendants are charged with possession of a firearm in furtherance of drug trafficking. Count 3 accuses Mr. Booker of possessing a pistol in furtherance of both the drug conspiracy and his PWID cocaine base offense. Count 7 accuses Mr. Cartwright of possessing a firearm in furtherance of the drug conspiracy and his PWID marijuana offense.

The elements of possession of a firearm in furtherance of drug trafficking are (1) the defendant committed a drug trafficking crime charged elsewhere in the indictment, (2) the defendant knowingly possessed a firearm, and (3) the possession of the firearm was in furtherance of one or more of the drug trafficking crimes charged

elsewhere. The following factors should be considered in deciding the third element: "(1) whether the firearm was strategically located so that it was quickly and easily available for use; (2) whether the firearm was loaded; (3) the type of weapon; (4) whether possession of the firearm was legal; (5) the type of drug trafficking crime; and (6) the time and circumstances under which the firearm was found."  Sixth Circuit Pattern Criminal Jury Instruction 12.03 (2022).

### D.  <u>*Count 5 – Felon in Possession of Firearms*</u>

Mr. Cartwright is charged in Count 5 with possessing firearms as a convicted felon, in violation of 18 U.S.C. § 922(g)(1). The elements of felon in possession of a firearm are: (1) that the defendant has been convicted of a crime punishable by imprisonment for more than one year, (2) that the defendant, following his conviction knowingly possessed a firearm, (3) that at the time the defendant possessed the firearm, he knew he had been convicted of a crime punishable by imprisonment for more than one year, and (4) the firearm crossed a state line prior to the alleged possession. Sixth Circuit Pattern Criminal Jury Instruction 12.01 (2022). The superseding indictment alleges Mr. Cartwright possessed three firearms, but it is sufficient if the evidence established that he possessed any one of them.  Sixth Circuit Pattern Criminal Jury Instruction 2.12 (2022).

Count 5, like other charges in this case, implicates actual and constructive possession. Sixth Circuit Pattern Criminal Jury Instruction 2.01 (2022).  To establish actual possession, the government must prove that the defendant had direct, physical control over the item and knew that he had control of it.  To establish constructive

possession, the government must prove that the defendant had the right to exercise physical control over the item and knew that he had this right, and that he intended to exercise physical control over it at some time, either directly or through other persons. To the extent others also had access to the guns and drugs recovered in this case, the charges also implicate joint possession.  Sixth Circuit Pattern Criminal Jury Instruction 2.11 (2022).

### E.    *Count 8 – Conspiracy to Commit Concealment Money Laundering*

Mr. Cartwright is charged in Count 8 with conspiracy to commit concealment money laundering, in violation of 18 U.S.C. § 1956(h) and (a)(1)(B)(i).  The elements are: (1) two or more people conspired, or agreed, to commit the crime of concealment money laundering and (2) the defendant knowingly and voluntarily joined the conspiracy.  Sixth Circuit Pattern Criminal Jury Instructions 3.01A, 3.02, 3.03 (2022). "Because the text of § 1956(h) does not expressly make the commission of an overt act an element of the conspiracy offense, the Government need not prove an overt act to obtain a conviction."  *Whitfield v. United States*, 543 U.S. 209, 214 (2005).

## III.    Evidentiary issues

### A.    *Expert witnesses*

The United States intends to call several expert witnesses in the fields of money laundering, drug trafficking, firearms nexus and operability, as well as the forensic chemists that analyzed the drugs that were seized.

In qualifying experts, Rule 702 is to be broadly construed. *Mannino v. Int'l Mfg. Co.*, 650 F.2d 846, 849 (6th Cir. 1981). In *Mannino*, the Sixth Circuit stated:

> Under the Federal Rules of Evidence, the only thing a court should be concerned with in determining the qualifications of an expert is whether the expert's knowledge of the subject matter is such that his opinion will likely assist the trier of fact in arriving at the truth. The weight of the expert's testimony must be for the trier of fact.

650 F.2d at 851; *see Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592–93 (1993) ("[A]n expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation.").

DEA Special Agent Gregory Pond will testify as an expert in drug trafficking. Agent Pond will testify about the methods by which drugs are distributed, including common quantities and prices. He will also testify about typical quantities in which drugs are used. He will testify about the various items (baggies, digital scales, etc.) that are used to measure, manufacture, and package narcotics for sale.

Special Agent Pond will testify that drug traffickers often use cars and properties registered to third parties to store, manufacture, and distribute narcotics in order to evade law enforcement detection. Pond will testify about the process by which cocaine is stored, broken down, measured, and packaged for sale, as well as the items used to do so. He will testify that drug traffickers often employ "runners," or third parties, to transport and/or sell drugs on their behalf. Agent Pond will describe the practice of "fronting," when a supplier provides drugs on the promise of later payment. Agent Pond will also testify that drug trafficking is predominantly a cash business, forcing dealers to either store large amounts of cash or to find ways to launder their drug proceeds.

12

Agent Pond will testify regarding common street names and slang for cocaine, as well as other ways drug traffickers refer to drugs to attempt to avoid law enforcement detection.  He will also testify regarding traffickers use of multiple cell phones, both to compartmentalize business and to avoid law enforcement. He will testify about the use of Facetime and other encrypted communications services by drug traffickers in order to avoid interception by law enforcement.

The United States has also notified the defendants that it intends to solicit some opinion testimony in the field of drug trafficking from Special Agent Alexis Giudice. Special Agent Giudice was the lead case agent in this case, so she will testify primarily as a fact witness. However, in order for Agent Giudice to explain the actions that she and her law enforcement partners took in this investigation, she will offer some expert testimony in the same areas as Agent Pond.

The United States intends to call IRS Special Agent Luis Reyna as an expert in the field of money laundering.  He will explain that money laundering is the process by which criminal proceeds are "laundered" or "cleaned" to disguise their origin and make them appear legitimate.  Agent Reyna will describe the methods used by drug dealers and money launderers to "clean" and legitimize funds and to avoid detection. He will explain how launderers inflate the income of cash businesses to conceal cash drug proceeds and deposit drug proceeds into accounts that contain legitimate income in order to make drug proceeds also appear legitimate. Agent Reyna will analyze Mr. Cartwright's records, bank statements, and the summaries of those documents and

discuss how the cash flowing through the account, in excess of that legitimately brought in by car sales, indicates that money is being laundered.

The United States has also notified the defendants that it intends to solicit some opinion testimony in the field of money laundering from IRS Special Agent Kim Singer. Special Agent Singer was the lead financial investigator in this case, so she will testify primarily as a fact witness. However, in order for Agent Singer to explain the actions that she and her law enforcement partners took in this investigation, she will offer some expert testimony in the same areas as Agent Reyna.

Special Agent Andrew Holt of the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) will testify as a firearms expert. He will testify that the firearms seized in this case travelled in interstate commerce before arriving in the State of Michigan. He will also testify as to the operability of the firearms seized.

Multiple forensic chemists will testify that they received suspected narcotics that were seized in this case.  They will describe the process by which they weighed and analyzed these samples, and they will explain the results of their analyses.

The United States has requested disclosure of any expert witness and testimony that Defendant intends to present, pursuant to Fed. R. Crim. Pro. 16(b)(1)(C).

### B.    *Co-conspirators' statements*

The government intends to offer statements made by co-conspirators in furtherance of the conspiracy, primarily in the form of the intercepted calls and text messages. Rule 801(d)(2)(E) allows admission of statements (that would otherwise be

considered hearsay) if it is a statement made "by the party's coconspirator during and in furtherance of the conspiracy." It is well settled that "[c]o-conspirator statements in furtherance of a conspiracy are both inherently trustworthy and 'firmly rooted.' '[T]he Confrontation Clause does not require a court to embark on an independent inquiry into the reliability of statements that satisfy the requirements of Rule 801(d)(2)(E).' " *United States v. Mooneyham*, 473 F.3d 280, 287 (6th Cir. 2007) (quoting *Bourjaily v. United States*, 483 U.S. 171, 183–84 (1987)).

To admit statements of a co-conspirator under Rule 801(d)(2)(E), a trial court must find that: (1) the conspiracy existed; (2) the defendant was a member of the conspiracy; and (3) the co-conspirator made the proffered statements in furtherance of the conspiracy." *United States v. Warman*, 578 F.3d 320, 335 (6th Cir. 2009) (citing *United States v. Wilson*, 168 F.3d 916, 920 (6th Cir. 1999)). This is sometimes referred to as an *Enright* finding. *Id.*; *see United States v. Enright*, 579 F.2d 980, 986–87 (6th Cir. 1978). The district court may "admit the hearsay statements subject to later demonstration of their admissibility by a preponderance of the evidence." *Warman*, 578 F.3d at 335 (citations and internal quotation marks omitted).

The grand jury need not have formally charged the defendants and the co-conspirators in the conspiracy in order for the government to avail itself of Rule 801(d)(2)(E), as the Court makes the determination of whether the requirements of the rule have been met by a preponderance as a preliminary question under Rule 104(a). *Bourjaily v. United States*, 483 U.S. 171, 181 (1987); *United States v. Swidan*, 888 F.2d 1076, 1080 (6th Cir. 1989). Admitting co-conspirator statements under Rule

801(d)(2)(E) does not implicate the doctrine of *Bruton v. United States*, 391 U.S. 123 (1968), *see United States v. Kendricks*, 623 F.2d 1165, 1167–68 (6th Cir. 1980), or the confrontation doctrine of *Crawford v. Washington*, 541 U.S. 36 (2004), *see United States v. Martinez*, 430 F.3d 317, 328–29 (6th Cir. 2005).

Communications between conspirators intercepted pursuant to a wiretap order are classically admitted under Rule 801(d)(2)(E). *E.g.*, *United States v. Toland*, 717 F. App'x 560, 564–65 (6th Cir. 2017); *United States v. Adams*, 655 F. App'x 312, 319 (6th Cir. 2016).

In *United States v. Vinson*, 606 F.2d 149 (6th Cir. 1979), the Sixth Circuit set forth three alternative methods of establishing the requirement for admissibility under Rule 801(d)(2)(E). First, the Court may hold a pretrial "mini-hearing" in which the government presents its proof of conspiracy and the Court makes a preliminary *Enright* finding. Second, the Court may require the government to meet its initial burden by producing the non-hearsay evidence of conspiracy at trial prior to making an *Enright* finding. Or, third, the Court may admit the coconspirator statements conditionally, subject to the government establishing the *Enright* requirements prior to the close of its proofs. *Id.* at 152–53. The United States requests that the Court employ the third method, which has been repeatedly approved by the Sixth Circuit. *See, e.g.*, *id.* at 149; *United States v. Christian*, 786 F.2d 203, 212 (6th Cir. 1986); *United States v. Holloway*, 731 F.2d 378, 382 (6th Cir. 1984).

16

### C.    *Other statements by the defendants and their coconspirators*

The defendants are not entitled to subsequently admit the remaining portions of statements, specifically the self-serving portions, or other calls without an independent basis of admissibility. Such statements would be hearsay. Rule 801(d)(2)(A) allows the use of an admission of a party opponent against that party. But this rule "does not extend to a party's attempt to introduce his or her *own* statements." *United States v. McDaniel*, 398 F.3d 540, 545 (6th Cir. 2005) (italics in original). If a defendant could present his own prior statements under Fed. R. Evid. 801(d)(2), then a defendant "could effectuate an end-run around the adversarial process by, in effect, testifying without swearing an oath, facing cross-examination, or being subjected to first-hand scrutiny by the jury." *McDaniel*, 398 F.3d at 545, citing *United States v. Ortega*, 203 F.3d 675, 682 (9th Cir. 2000).

The failure to admit such evidence does not violate the Confrontation Clause or the so-called "rule of completeness." *United States v. Ford*, 761 F.3d 641, 652 (6th Cir. 2014) ("[T]he rule of completeness is not designed to make something admissible that should be excluded. Right or wrong, this court has acknowledged that under *Costner*, exculpatory hearsay may not come in solely on the basis of completeness.") (quotations and citations omitted).

### D.    *Summary exhibits*

The government intends to offer several summary exhibits in three categories. First, the government intends to offer exhibits summarizing the phone tolls demonstrating the extent of communication between the conspirators. This toll

analysis is a proper subject of summary exhibits. *See United States v. Gaitan-Acevedo*, 148 F.3d 577, 587–88 (6th Cir. 1998).

Second, the government intends to offer exhibits summarizing text messages and other evidence collected from Cellebrite extractions of phones seized from Mr. Cartwright and Mr. Booker. *See United States v. Kilpatrick*, 798 F.3d 365, 383 (6th Cir. 2015); *United States v. Osborne*, 677 F. App'x 648, 655–56 (11th Cir. 2017).

Finally, the government intends to offer exhibits summarizing Mr. Cartwright's cash flow – both moved through the relevant bank accounts as well as through the Auto Den car dealership.

The draft proposed exhibits will be disclosed to defense counsel before the final pretrial conference.  If not stipulated to, the government will file a motion before trial for their admission.

### E.    *Record evidence*

The government intends to offer certain business and public records, which are exceptions to the hearsay prohibition pursuant to Rules 803(6) and (8), respectively. Specifically, the government intends to offer:

   i.    toll and subscriber records from phone companies.
   ii.   sales records from the businesses associated with Mr. Cartwright and his coconspirators (Auto Den, 851 Davis, Car Genie, Cartwright Construction, K&J Muffler d/b/a Muffler Man)
   iii.  JP Morgan bank records for Mr. Cartwright, James Moore, and their associated businesses (listed above)
   iv.   tax returns for Mr. Cartwright, James Moore, and their associated businesses (listed above)

> v.    Articles of incorporation/organization and associated documents and annual reports regarding Mr. Cartwright and James Moore's associated businesses (listed above)

The government may bring in live witnesses for some of the records, and others may be offered through a Rule 902(11) certificate. *See, e.g.*, *United States v. Adefehinti*, 510 F.3d 319, 327–28 (D.C. Cir. 2007); *United States v. Ellis*, 460 F.3d 920, 927 (7th Cir. 2006).

### F.    *Impeachment*

Some evidence of malfeasance within Mr. Cartwright's companies is pertinent to the charged offenses and will be presented in the government's case in chief (*e.g.,* inflating car sale prices in bookkeeping to disguise drug proceeds, recording cash car sales that did not occur, possession of counterfeit U.S. currency at Auto Den). However, if Mr. Cartwright testifies, the government may impeach him with evidence of his other dishonest business practices. For example, customers report that Mr. Cartwright misrepresented the condition of cars they bought from him, resulting in the cars breaking down shortly after purchase.  Additionally, Mr. Cartwright fabricated tax documents inflating his income and used them in loan applications. These inflated tax documents contradict the versions of the same forms that he filed with his annual tax returns.

Fed. R. Evid. 608 provides that the court may permit cross-examination regarding specific instances of conduct "if they are probative of the character for truthfulness or untruthfulness" of the witness.  This proposed evidence directly bears

on Mr. Cartwrights truthfulness and will be reserved until and unless Mr. Cartwright places his truthfulness at issue.

### G.    ***Transcripts of wire intercepts***

The government intends to admit and present a number of wire intercepts during trial. To assist the jury in analyzing these calls, there will be companion transcripts. The Sixth Circuit has approved such practice:

> When a recording is admissible, an accurate transcript of the recording may be provided, in the trial court's discretion, for the jury to use while the recording is played, so that the jury may follow the recording more easily. *See Robinson, supra* at 876. But the Sixth Circuit has expressed a clear preference that a transcript not be submitted to the jury unless the parties stipulate to its accuracy. *Id.; see also Vinson, supra* at 155.
>
> In the absence of a stipulation, the transcriber should verify that he or she has listened to the recording and accurately transcribed its content, and the court should make an independent determination of accuracy by comparing the transcript against the recording and directing the deletion of the unreliable portion of the transcript. *Robinson, supra* at 879.
>
> \* \* \*
>
> *See also Scarborough, supra* at 1024-25 ( no error to use government's transcript where district court reviewed it and found it accurate and gave limiting instruction); *United States v. Wilkinson*, 53 F.3d 757 (6th Cir. 1995) (any potential prejudice from use of government's transcript was remedied, *inter alia*, by a cautionary jury instruction), *citing United States v. Hughes*, 895 F.2d 1135, 1147 (6th Cir. 1990). In *United States v. Elder*, 90 F.3d 1110, 1129-30 (6th Cir. 1996), the Sixth Circuit held that it was not error to allow transcripts as an aid to the jury when the trial judge followed the *Robinson* guidelines to review the recordings and gave a limiting instruction substantially the same as Pattern Instruction 7.17.

Sixth Circuit Pattern Jury Instructions § 7.17 committee commentary (2019).

H.    ***Evidence of Coconspirators' drug trafficking and gun possession***

Investigators found guns in Mr. Cartwright's home and drugs and a gun at his business. The government intends to present testimony that investigators similarly found drugs and/or guns in his coconspirators' possession. Specifically, there was ammunition and drug packaging implements at Mr. Johnson's home in Detroit. There was ammunition, cocaine, crack, cash, and drug packaging implements in Mr. Booker's apartment. Similarly, there were pictures and videos of guns and cash in Mr. Booker's phone. There was crack, heroin, cash, ammunition, and drug packaging implements in Mr. Moore's apartment; cocaine, cash and drug packaging implements at his business (Muffler Man); and guns, ammunition, body armor, cocaine, heroin, cash, and a money counter in his storage unit.

The government is entitled to present and prove "the entire scope of the conspiracy." *United States v. Kelley*, 849 F.2d 999, 1004 (6th Cir. 1988). For example, in *United States v. Beard*, 394 F. App'x 200, 202 (6th Cir. 2010), the government presented testimony regarding a search of a codefendant's home where drugs, cash, and packaging materials were found. The defendant argued that evidence was inadmissible against him. The Sixth Circuit rejected that claim, finding that the drug-related items in the defendant's coconspirator's home were "directly probative of the scope of the conspiracy; the fact that [the defendant] was not involved in the sale of the particular drugs found during the search results in no significant prejudice." *Id.* at 204.

The same applies to a coconspirators' possession of guns or cash as they are relevant to show involvement in a drug trafficking conspiracy. *United States v. Crespo de Llano*, 838 F.2d 1006, 1019-20 (9th Cir. 1987). The availability of loaded firearms, whether to the defendant or a coconspirator who is not on trial, is "relevant on the issue of the existence of the drug conspiracy. *United States v. Emmanuel*, 112 F.3d 977, 980 (8th Cir. 1997).

IV.   Proposed Stipulations

The United States has proposed numerous stipulations to streamline the trial presentation. To date, the parties have not agreed upon any stipulations. The proposed stipulation topics are:

A.   Admission of the drugs located at Auto Den, Muffler Man, Mr. Moore's storage unit, Mr. Moore's apartment, Mr. Booker's apartment, and Mr. Cartwright's home.

B.   Accuracy and admission of the corresponding lab reports regarding the suspected controlled substances seized at these locations.

C.   Identification of the users of the phones listed in the Title III documentation, including but not limited to, James Moore, Dennis Cartwright, Jemar Mason, Mykael Booker, and Eiland Johnson.

D.   Admission of the wire interceptions (oral and wire) and transcripts, including the accuracy of associated dates, times, and phones number (incoming and outgoing).

E.   On and before December 1, 2020, Cartwright was aware that he had previously been convicted of one or more felony offenses that disqualified him from lawfully possessing a firearm or ammunition.

F.   The (1) .380 caliber Smith & Wesson Bodyguard pistol (serial number: LAH34048), (2) Smith & Wesson 38 Special revolver (serial number: 335173), and (3) .40 caliber Smith & Wesson Springfield Model 4006TSW pistol (serial number: TDS9123) meet the statutory definitions of "firearm. These firearms were

manufactured outside the State of Michigan and travelled through interstate commerce before December 1, 2020.

G.    Admission of the following JP Morgan Chase bank records from November 2018 through December 2020 and their respective signature cards:
(1)    *1662 – Dennis Cartwright d/b/a Cartwright Construction
(2)    * 2556 – James Moore
(3)    *3608 – Auto Den, LLC
(4)    *5926 – K&J Muffler, LLC d/b/a Muffler Man
(5)    *6238 – 851 Davis, LLC
(6)    *9950 – Car Genie, LLC

H.    Admission of state and federal tax records for the following entities:
(1)    Dennis Cartwright
(2)    Cartwright Construction
(3)    James Moore
(4)    Auto Den, LLC
(5)    K&J Muffler, LLC d/b/a Muffler Man
(6)    851 Davis, LLC
(7)    Car Genie, LLC

I.    Admission of Michigan LARA documentation for the following entities:
(1)    Cartwright Construction
(2)    Auto Den, LLC
(3)    K&J Muffler, LLC d/b/a Muffler Man
(4)    851 Davis, LLC
(5)    Car Genie, LLC

J.    Qualification of proposed drug trafficking experts and money laundering experts, as well as admissibility of their proposed testimony.

K.    Foundation and accuracy of the of relevant contents of Mr. Booker's and Mr. Cartwright's cell phones, including pictures, videos, and messages regarding guns, drugs, and money during the charged conspiracy.

L.    Admission and foundation of toll records for Mr. Cartwright, Mr. Moore, Mr. Booker, and Mr. Johnson's phones.

M.    Foundation and admission of still photos from Home Depot on November 4, 2020.

In the absence of the stipulation above ("E") regarding Defendant's knowledge

of his prior felony convictions, the United States intends to admit evidence about

those cases.  This includes, but is not limited to, the number of convictions, crimes of

conviction, length of incarceration ordered, and details of his probation or parole.

Respectfully submitted,

ANDREW BYERLY BIRGE
United States Attorney

Dated: March 21, 2022          /s/ *Austin J. Hakes*
                               AUSTIN J. HAKES
                               ERIN K. LANE
                               Assistant United States Attorneys
                               P.O. Box 208
                               Grand Rapids, MI 49501-0208
                               (616) 456-240